UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE


RON WADE, et al.                                                    PLAINTIFFS

V.                                             CIVIL Action No. 3:01CV-699-R

THE KROGER CO., et al.                                             DEFENDANTS


## <u>MEMORANDUM OPINION</u>

Plaintiffs have moved the Court for final approval of the Class Action Settlement entered into with the Kroger Defendants.  The Court has reviewed the Plaintiffs' motion, Defendants' responses thereto, and has considered all objections filed with the Court.  In addition, on October 27, 2008, the Court conducted a Fairness Hearing on the proposed Settlement and invited all persons present to comment or object.  Pursuant to FED. R. CIV. P. 23(e), and for the reasons set forth herein, the Court also finds that class counsel provided notice of the Settlement to all potential class members in a reasonable manner, that the relatively small number of objections received lack merit, and that the Settlement is fair, reasonable, and adequate.

Plaintiffs' counsel also have moved the court for approval of their requested award of fees and expenses.  Although all counsel (including Defendants') appear to be in agreement regarding the total amount of the Settlement Fund to be allocated for attorney fees and expenses, there is a disagreement regarding the amount due one of the attorneys, Grant E. Morris.  Accordingly, Plaintiffs' counsel have requested the Court's assistance in determining the appropriate allocation of fees among counsel.  For the reasons stated herein, the Court finds the overall award of twenty-five percent of the Settlement amount to be a reasonable and appropriate award for the fees and expenses incurred in prosecuting this litigation.  In addition, the Court has

carefully reviewed Mr. Morris's requests for a fee award, his billing statements and affidavits, and all responses thereto.  Given the nature and extent of Mr. Morris's involvement in this litigation, the Court finds that he should be awarded no more than $200,347.95, rather than the significantly higher amounts he has requested.

## I.

This hard, but civilly and well-fought, litigation has been almost eight years in reaching conclusion.  After extensive discovery, motion practice, statistical analyses, and countless mediation sessions conducted by a United States Magistrate Judge and an independent mediator, the parties have agreed upon a settlement that achieves programmatic and monetary relief for a group of over 340,000 current and former African American employees of the Defendants.

The terms of the Settlement and Plan of Allocation are enumerated in the Consent Decree granted preliminary approval by the Court on June 24, 2008 (*see* docket nos. 161 and 162). Following that preliminary approval, Settlement Services, Inc. (the claims administrator selected by the parties) mailed Notice of the Settlement to all potential class members via first-class mail and in the form and manner approved by this Court.  Because many of the addresses received from Kroger had become outdated, the claims administrator then used a tracing mechanism and sent additional Notices and claim forms to the addresses obtained using the tracing mechanism. In addition, the law firm Cohen, Milstein, Hausfeld & Toll, P.L.L.C., one of the lead counsel for the class, posted the Consent Decree on its website.[1]  The Court finds that this notice process is adequate under FED. R. CIV. P. 23 and the standards of due process, because it was directed in a reasonable manner to all prospective class members who would be bound by the Settlement Agreement and, in a manner that could be understood by the average prospective class member,

---

[1]*See* http://www.cmht.com/cases_kroger.php.

fairly apprised the prospective class members of the terms of the proposed Settlement Agreement and their options with respect to their decision whether to join in the class.  *See, e.g., Int'l Union, United Auto., Aerospace, and Agricultural Workers of America  v. General Motors Corp.*, 497 F.3d 615, 630 (6th Cir. 2007).

Out of a total class of 341,626, approximately 47,000 have filed timely claim forms.[2] Only thirty-six persons[3] elected to opt out of the Settlement, and only eleven persons objected to the Settlement in writing.  At the hearing, none of the class members present accepted the Court's invitation to object to the Settlement in open court.  The one person who did speak noted that she had never observed any discrimination during her tenure at Kroger, but nevertheless felt she was not adequately compensated.

The eleven written objections fall into two categories.  The first category of objections pertains to the exclusion from the class those members who had not completed their thirty to ninety day probationary period and those who had, but whose total recovery would not amount to more than fifty dollars.  Given the large number of the class, and the also large (but lesser) number of former employees whose employment lasted no longer than ninety days,[4] the inclusion of probationary employees, whose recovery at most would be no more than

---

[2]Six hundred eighteen persons sent in claim forms that were post-marked after the October 14, 2008, deadline, but were received before the October 27, 2008, Fairness Hearing.  At the Fairness Hearing, counsel for the parties advised the Court that they would not object if the Court decided to treat this relatively small number of late claims as timely received.  Given both parties' lack of any objection, the fact that the initial deadline essentially was an arbitrary one set for administrative convenience, and the fact that the small number of untimely, but not shockingly late (less than two weeks), claims will not noticeably dilute the recovery coming to those who filed their forms on time, the Court will permit all claims received by the Settlement Administrator on or before October 27, 2008, to be treated as if they were timely filed.

[3]The parties agreed that Kroger would have the right to void the Consent Decree if 750 or more persons elected to opt out of the Settlement.

[4]Employees' probationary periods differed by marketing area, and were either thirty, sixty, or ninety days long, depending on the collective bargaining agreement in place within that area.

approximately seventeen dollars, would not only drastically and unfairly reduce the amount

recovery available to those class members who had completed their probationary periods, but

would be eclipsed by the costs of administering the claims (*e.g.,* issuing checks, preparing W-2

and 1099 tax forms, and calculating and withholding employee taxes).  Similarly, the concern

about the unavoidable cost of administration led the parties to agree on a fifty-dollar minimum

claim exclusion, so that recovery for all otherwise eligible claimants would be more than *de

minimis*.  The Court finds both exclusions to be not only fair and reasonable, but appropriate.

The second category of objections pertains to the provision in the Settlement Agreement

that establishes a review system for store managers' decisions to adjust employees' starting pay

rates based on their prior experience.  Those who object are concerned because the first line of

review, the newly-created position of Hourly Starting Rate Monitor, is a Kroger employee.  The

objectors are worried that an "in-house" monitor will not be fair or impartial.  Although the

Court understands the basis for the objectors' concerns, the Court does not find this objection to

be well-taken because of the additional layers of oversight mandated by the Consent Decree.  To

begin with, Kroger has agreed to keep records regarding the race of all candidates who receive

experience credit, the amount awarded, and the person's experience-credit-enhanced starting pay

rate.  Kroger will provide those records annually to Plaintiffs' class counsel, who will analyze

that data and serve as an independent monitoring system for Kroger's efforts to reduce race-

based pay disparities in its workforce.  If there are statistical indicia of race-based disparities,

Plaintiffs' counsel are empowered to take action within the parameters established by the

Consent Decree.  Accordingly, the Court does not find the implementation of the Hourly Starting

Rate Monitor, absent more, to be an appropriate basis for objecting to the Settlement.

## II.

The Court's analysis of the propriety and fairness of the Settlement Agreement, does not end with an analysis of specific objections raised, however.  Federal Rule of Civil Procedure 23 states that the Court may approve a settlement that would bind class members only after a hearing and a determination that the settlement is fair, reasonable, and adequate.  As noted previously, the Court conducted a Fairness Hearing on October 27, 2008, at which counsel for the parties and several class members were present and invited to proffer evidence sufficient to allow the Court to review the terms and legitimacy of, or object to, the Settlement.  Although no one chose to present any objections, counsel for the both Plaintiffs and Defendants filed pre-hearing briefs and documentation to assist the Court in its determination.

The Court will now determine whether the Settlement comports with the requirements of FED. R. CIV. P. 23.  The United States Court of Appeals for the Sixth Circuit has held that the following seven factors should "guide the inquiry":

1. The risk of fraud or collusion (*i.e.,* whether the settlement is the product of arm's-length negotiations, or collusive bargaining);

2. The complexity, expense, and likely duration of the litigation;

3. The amount of discovery engaged in by the parties and the significance of the evidence uncovered;

4. The likelihood of success on the merits viewed in light of the amount and form of relief offered in the settlement;

5. The opinions of experienced class counsel and class representatives as to the strength of their claims;

6. The fairness of the terms of the settlement to unnamed class members; and

7. The consistency of the settlement with public interest.

*International Union,* 497 F.3d at 631 (internal citations omitted).  No one of these factors is

dispositive.  Rather all are to be weighed and considered in light of the particular demands of this

case.  *See, e.g., Granada Investments, Inc. v. DWG Corp.*, 962 F.2d 1203, 1205-06 (6th Cir.

1992).  The Court will now discuss each in turn.

**A.      The Risk of Fraud or Collusion Among Counsel**

The Court has not been presented with any evidence that the resolution of this matter was

the result of anything other than hard-fought,[5] arm's length negotiation.  In total, the extra-

judicial resolution of this matter was over seven years in the making, and has required extensive

statistical analysis of copious amounts of historical workforce data and the repeated assistance of

the mediation efforts of United States Magistrate Judge James D. Moyer to reach agreement

simply on the terms of the settlement amount and the broad elements of the programmatic relief.[6]

Once that was accomplished, the parties required the further assistance of an independent

mediator to resolve their disputes regarding particular terms of the Consent Decree.  Moreover,

at one point, the parties thought they had reached agreement, but then started anew another

lengthy process of settlement negotiations when finalization of their putative agreement revealed

that Plaintiffs' counsel and Defendants' counsel had a different understanding of the temporal

scope of the proposed class.  Accordingly, although the risk of collusion can never be nil, the

---

[5]Counsel for the parties have been unfailingly professional and cordial to each other in all of their appearances before the Court and have worked cooperatively and well to bring this case to conclusion. Although such a high degree of fair dealing and mannerly behavior is no longer the norm, it fortunately has not become so rare as to raise suspicion of collusion in and of itself.  The attorneys who have regularly appeared before this Court and United States Magistrate Judge Moyer are to be commended for vigorously representing their respective clients' interests without sacrificing their professionalism or affability.

[6]Over a four-year period, counsel for the parties and occasionally retained experts and class representatives made several trips to Louisville to engage in full-day mediation sessions with Magistrate Judge Moyer.

Court finds that the evidence before the court indicates that the risk of collusion among counsel is so small that it is effectively non-existent.

**B.      The Complexity, Expense, and Likely Duration of the Litigation**

The complexity, and likely expense and duration of this litigation, had the case proceeded to trial, were significant.  Not only were Plaintiffs suing a group of defendants that comprised a national chain of grocery stores, but the Kroger organization that the Defendants comprise is divided into several distinct "marketing areas," each with its own organizational differences.  Moreover, the potential class of employees, many of whom were unionized, were subject to over sixty collective bargaining agreements, each of which would have a potential effect on the parameters of the proof and the amount of potential damages.  Moreover, this case ultimately turned on the statistical disparities pertaining to pay rates of both hourly and salaried employees, thereby requiring high-level expert assistance and extensive statistical analysis.  The process of obtaining and agreeing upon the correct data for the parties' respective analyses, and then interpreting the data, required several years alone.  All of these issues would have been the appropriate, and likely, basis for extensive motion practice.  Had discovery and motion practice proceeded with pre-trial vigor, as opposed to the more limited and focused discovery and motion practice necessary to adequately inform the parties' decisions regarding settlement, it is safe to assume that the additional expenditure of time, money and judicial resources would have been quite costly.  The Settlement, therefore, promotes the interest of the class in obtaining a higher ratio of recovery to expense than likely would have been obtained had the parties gone to trial.

**C.      The Amount of Discovery Engaged In by the Parties**

As alluded to in the previous paragraph, and at the suggestion of the United States Magistrate Judge acting as the mediator, the parties agreed to adopt a two-tier approach to

discovery relatively early in the litigation.  Rather than engage in the expansive discovery necessary to prepare a case for trial, they agreed to focus first on obtaining only that discovery that would assist them in making a rational and informed settlement decision and then, if settlement efforts were unsuccessful, to expand their discovery efforts to prepare for trial.  Even with this agreement, however, the parties' discovery was significant in terms of both time and scope.  Over the course of several years, the Plaintiffs sought and obtained information regarding the Defendants' personnel policies and also copious amounts of data regarding current and former employees that would allow statisticians to determine whether there was any statistical indication of disparate treatment of the Defendants' African American employees.  It is this information, not depositions of corporate defendants or the named Plaintiffs, that ultimately allowed the parties to frankly evaluate the merits of and risks inherent in their respective cases and, as importantly, to determine an appropriate settlement value.  Indeed, the statistical analysis that resulted from this focused discovery was the key factor permitting informed, well-reasoned settlement negotiations.  Accordingly, although the discovery engaged in was not exhaustive, it was thorough and appropriately tailored to allow the parties to determine not only an overall settlement amount, but to fairly and adequately determine an allocation of that amount for the named Plaintiffs and the unnamed members of the potential class.

**D.     The Likelihood of Plaintiffs' Success on the Merits**

One of the principal factors pertaining to the degree to which the parties' settlement decisions  were informed and intelligently made, was their evaluation of the Plaintiffs' likelihood of success on the merits.  As the Sixth Circuit has aptly noted, the "fairness of each settlement turns in large part on the bona fides of the parties' legal dispute."  *Int'l Union*, 497 F.3d at 631.  This Court is not required to decide the merits of the case or resolve unsettled legal questions

before deciding whether to approve the Settlement.  "The question, rather, is whether the parties are using settlement to resolve a legitimate legal and factual disagreement."  *Id.* at 632.  That being said, the Sixth Circuit has determined that a court cannot properly evaluate the fairness of a proposed compromise without "weighing the plaintiff's likelihood of success on the merits against the form and relief offered in the settlement."  *Id.* (citing *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981)).

In this matter, the Court finds that the Plaintiffs' likelihood of success on the merits was legitimately possible, but the Court expresses no opinion as to whether it was probable.  Possible impediments to class certification aside, Plaintiffs' success at trial was by no means guaranteed.  The jury could have been moved by live testimony regarding perceived racism and awarded a high damages award.  On the other hand, the extensive amount of expert testimony and statistical analysis that would have been required, might have caused the jury to lose interest in the human element of the case, or their minds to grow fatigued, thereby resulting in either a lower than expected damages award, or a defense verdict.  One cannot know for sure, and the Court has seen enough trials to realize the folly of prediction.  The Settlement eliminates risk and that alone is a not-insignificant ancillary benefit.  What is more, Defendants have agreed to specific, non-trivial programmatic relief that will continue to benefit those members of the class who remain Kroger employees, in addition to the monetary relief.  This is a significant component of the Settlement that might not have been achieved at trial, as juries (of necessity) tend to paint with far broader brushes.   Accordingly, the amount and nature of the Settlement appear to be a reasonable and appropriate tradeoff for the elimination of the risk not only of loss, but of a lower value jury verdict in their favor.

**E.      The Opinions of Experienced Class Counsel and Class Representatives as to the Strength of Their Claims**

Class Counsel, comprised of the firms Cohen, Milstein, Hausfeld & Toll, P.L.L.C., and Wiggins, Childs, Quinn & Pantazis, L.L.C., are experienced counsel who have extensively litigated individual and class actions dealing with allegations of race discrimination. Class Counsel did not rush to settlement, but rather engaged in thoughtful, narrowly-tailored discovery that would allow them to appropriately analyze the relative strength of the claims presented and to make an informed demand for not only monetary, but programmatic relief. This required a considerable amount of time, thought, and effort over a seven year period. Moreover, Class Counsel have not otherwise displayed to the Court any inclination to promote expediency over the interests of the class and, for example, refused to finalize what appeared to be an agreed upon settlement of this matter when they realized that the Defendants' counsel had a different understanding of the temporal scope of the agreement. Rather, any concessions that have been made have been framed in terms of a frank and informed understanding of any practical or legal risks inherent in their prosecution of Plaintiffs' claims.

As for the Class Representatives, they have participated in settlement conferences with the United States Magistrate Judge and, to the Court's knowledge have been fully informed and involved participants in the settlement negotiations. None of the named representatives have objected to the Settlement Agreement, or asked to withdraw from this litigation.

**F.    The Reaction to the Settlement of Absent Class Members**

With respect to the unnamed class members, the potential Class consists of approximately 342,000 current and former Kroger employees. Although the Notice of the Settlement Agreement was sent to that many persons, and contained detailed instructions for submitting objections and for opting out of the settlement, only eleven persons objected and only thirty-six opted out. The number of objections is minuscule in comparison to the number of

persons who actually returned claim forms (approximately 47,000), much less the number of potential class members who were advised of the Settlement Agreement's terms.  The number of persons who chose not to join in the settlement is not appreciably larger.  The Court therefore concludes that the overwhelming majority of the potential class members have no objection to the terms of the Settlement Agreement.

With respect to those who have objected, the mere existence of their objections does not warrant scuttling the parties' agreement.  As noted above, the objections fell into two categories: those who objected to the decision to exclude from the class those whose recovery would be less than $50 dollars (either because they had not completed their probationary period, or because their damages calculations were simply that low), and those who were concerned about institutional bias affecting one element of the programmatic relief.  The Court does not find either of these concerns to be an appropriate basis for any decision not to approve the Settlement Agreement.

**G.      The Public Interest**

Lastly, the Court notes that there is a federal policy favoring settlement of class actions, *see Int'l Union,* 497 F.3d at 632 (citing *In re Warfarin Sodium Antitrust Litig.*, 391 F3d 516, 535 (3rd Cir. 2004)), and the Court can find no principled basis for not adhering to that policy in this matter.  All other elements of the Settlement Agreement notwithstanding, the programmatic changes that will inure to the benefit of current and future Kroger employees on a going-forward basis constitute a meaningful, lasting response to the allegations of workplace race-discrimination.  In addition, the conservation of Western District of Kentucky's judicial resources, which were significantly expended on the settlement efforts alone, is substantial.  The Court therefore finds that the public interest warrants approval of the Settlement.

**III.**

Having determined that final approval of the Settlement Agreement is warranted, the Court must now turn to the issue of the propriety of the amount and the appropriate allocation of attorney fees.  With respect to the total amount of fees and expenses to be awarded, all of the Plaintiffs' attorneys are in agreement that a reasonable award should be twenty-five percent of the settlement amount (*i.e.*, $4 million).  Defendants have no objection to this amount.

Counsel are further in agreement that expenses and the fees incurred by the firm Sales, Tillman & Wallbaum, shall be deducted first from the overall award, and the remaining attorneys' fees allocated from the remainder.  Plaintiffs' co-Lead Counsel (the firms Cohen, Milstein, Hausfeld & Toll, P.L.L.C., and Wiggins, Childs, Quinn & Pantazis, L.L.C.) are further in agreement that the amount remaining after expenses and Mr. Sales's firm's fees are deducted should be allocated equally among their two firms, with Cohen, Milstein assuming responsibility for reimbursing an attorney who assisted them during the early stages of the case (Bruce Whitman) from their share, and Wiggins, Childs reimbursing from its share an attorney who assisted that firm during the case's early stages (Grant E. Morris).   Mr. Whitman has no objection to this arrangement.  Mr. Morris, however, has requested that the Court issue an order requiring direct payment to him.  The reason for Mr. Morris's request is an apparent disagreement among counsel with respect to the amount Mr. Morris should be compensated.

**A.      The Amount of the Overall Award for Fees and Expenses**

Plaintiffs' counsel have requested an award of twenty-five percent of the Settlement amount for the fees and expenses.  Although the amount of that award – $4 million – is undeniably large, the question for this Court is whether it is reasonable. *See, e.g., Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1996).   There are two methods

considered acceptable in the Sixth Circuit for evaluating the reasonableness of a fee request and determining the appropriate amount of a fee award.

With either method, the goal is make sure that counsel are fairly compensated for the amount of work done and the results achieved. "The lodestar method better accounts for the amount of work done, while the percentage of the fund method more accurately reflects the results achieved." *Id.* In this matter, the Court finds that awarding a percentage of the fund for fees and expenses is the better choice.

To begin with, although the amount requested ($4 million) is no small number, when viewed solely in terms of percentage (25%), the requested award is not inherently objectionable. In the range of percentages commonly commanded in contingency fee cases, twenty-five percent does not place this request at the upper end of the scale, much less shock the conscience. This was a complex case that lasted over seven years and required a high degree of competency, professionalism and skill from respected counsel in the field of race discrimination to encourage the Defendants to engage in meaningful settlement negotiations and to agree upon a significant amount of monetary relief. Moreover, the Defendants comprise a national chain of grocery stores and the programmatic relief achieved by the Settlement serves an important societal benefit, beyond that afforded the plaintiff class, of encouraging the reduction of race-based discrimination in one of the country's largest employers.

In addition, the percentage requested is not just for fees. Class Counsel have requested that amount be set aside for fees and expenses, and the expenses incurred have been significant, given the high degree of expert assistance required simply to interpret the data produced and to evaluate the propriety of the Settlement. In addition, it has taken over seven years for this case

to reach conclusion, and the last four have required the parties and their counsel to make frequent trips to Louisville for mediation sessions and related court appearances.

Moreover, when cross-checked against the lodestar amount that could be awarded, the percentage of the fund amount is not shockingly higher. The Court has conducted a cursory review of Class Counsel's billing statements and agrees with their assertion that the hours they expended are not unreasonable given the nature and duration of this litigation. Their lodestar fee with current hourly rates (the Court would have preferred they submitted historical rates, but the current rate calculation is a starting point), is approximately $2.4 million dollars. After fees and expenses (currently approximately $350,000) are deducted from the percentage of the fund award, that amount is a little over $1 million more than the lodestar fee calculation. Given the risk of non-recovery incurred by national counsel, the quality of their work, and the societal benefit achieved, the additional amount received by using the percentage of the fund method, is not unreasonable in this Court's opinion. *Cf. Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996)(enumerating factors to consider when evaluating a percentage of the fund request and noting without disapproval the district court's decision to cross-check the fee against class counsel's lodestar); *Rawlings*, 9 F.3d at 516 (noting that the lodestar method has been criticized for being "too time-consuming of scarce judicial resources" and approving the district court's decision to use the percentage of the fund method, even though that resulted in an fee award appreciably higher than the lodestar rate).

**B.     The Allocation of Fees Among Counsel**

**1.     Mr. Morris's Fee Request**

Mr. Morris has asked the Court to use the lodestar method[7] in calculating his fee award, and has petitioned this Court for an award of $712,687.50, plus a reasonable risk multiplier, to be paid directly to him.  He later reviewed his billing records, conceded that some of the time was mis-allocated and arguably duplicative, and reduced his request to $400,000.  The Court has reviewed Mr. Morris's billing records, too.  They raise three principal concerns:  the travel costs, the hourly fee requested, and the nature of the work performed.

In reviewing Mr. Morris's records the Court observed that over half the time billed by Mr. Morris was spent traveling.  Mr. Morris practices in the Washington, D.C., area and, to meet with persons who had or may have had information pertaining to what eventually became this case, he traveled frequently to cities in Alabama, Georgia, Kentucky, and Tennessee.  The mid-South cities he visited (*e.g.,* Louisville, Nashville, Birmingham) either had, or were near hubs of Southwest Airlines, and it would therefore have been relatively inexpensive for him to have flown.  Instead, he chose to drive, incurring as much as fourteen hours travel time each way. The Court can understand why he would choose to travel by car when he was gathering information and did not yet have any reasonable expectation of being reimbursed for his travel costs, but not why he ultimately would seek compensation for the entirety of that time.  Had he been issuing contemporaneous bills to clients whom he expected to pay him monthly, his clients certainly would have demanded that he either fly rather than drive, or bill them no more than the

---

[7]In spite of the fact that it has been "too time-consuming of scarce judicial resources," *Rawlings*, 9 F.3d at 516, the Court agrees that the lodestar method is the appropriate mechanism for determining the specific amount of Mr. Morris's fees.  This is so because Mr. Morris's efforts, while not undeserving of some level of payment, cannot be said to have significantly contributed to the results achieved.  He did not significantly participate following the filing of the Complaint.  Accordingly, the Court can find no principled basis for awarding Mr. Morris a percentage of the fund.  *Cf. Rawlings*, 9 F.3d. at 516 (leaving to the Court's discretion whether to apply a lodestar or percentage of the fund calculation when evaluating the propriety of a fee award and noting that the lodestar method is better suited for awarding compensation based on the work performed, while the percentage of the fund method is better suited for awarding compensation based on the significance of result).

cost he would have incurred flying (*i.e.,* attorney hours, airline ticket, any needed ground transportation).  The Court is therefore at a loss to understand why Mr. Morris considers it appropriate to request compensation for the excessive hours now.

This concern is heightened by the hourly rate requested by Mr. Morris.  In his petition, Mr. Morris indicated that he thought a uniform hourly rate of $671 would be appropriate given his years of experience.  He did not indicate whether this requested rate was what he customarily charged, or higher, or lower.  Instead, he based his request on the Adjusted Laffey Matrix[8] of hourly rates for lawyers in the Washington, D.C., metropolitan area (*see* www.laffeymatrix.com) and, given that he had more than twenty years' experience, he requested the 2008-2009 rate for a person of comparable experience.  Without explaining why, he then offered to reduce his uniform rate to $625 per hour, which is somewhere between the 2006-2007 rate ($614) and the 2007-2008 rate ($645) on the Adjusted Laffey Matrix.   Mr. Morris did not work on this case during 2007, or 2006, however.  Rather, he billed time from 1999 through 2003.  During that time period, the Adjusted Laffey Matrix claims that reasonable rates for a Washington, D.C., attorney with his years of experience ranged from $424 an hour to $549.  The bulk of Mr. Morris's time was incurred during 2000 and 2001, when the rates were between $444 and $487 an hour.

---

[8]The *"Laffey* Matrix" is a matrix of hourly rates for D.C.-area attorneys and paralegals of varying experience levels.  It is based on the hourly rates allowed by the District Court in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), and is updated yearly.  There are actually two *Laffey* matrices that have been accepted as guidelines for awarding recovery of "reasonable" attorney fees to those practicing in the Washington, D.C. area.  The first matrix is updated and maintained by the D.C. U.S. Attorney's Office (*see* www.usdoj.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_2.html, and explanatory notes thereto).  The other matrix, known as the Adjusted Laffey Matrix, is updated and maintained by Dr. Jeffrey Kavanaugh, an economist (*see* www.laffeymatrix.com).   The rates contained in the Adjusted Laffey Matrix are higher than those contained in the USAO's Laffey Matrix.

According to either *Laffey* Matrix, Mr. Morris's "reduced" fee request is a significant increase over what reasonably could have expected to receive for contemporaneous billing – too significant to reasonably account for the delay in payment or his risk of non-payment.  It also underscores the unreasonableness of his request for payment of all of his travel time.  His decision to drive to and from the mid-South for each meeting, which often putatively took fourteen hours each way, results in a $17,500 price tag per trip at his requested rate of $625 per hour.  That is *not* reasonable.

The Court also questions why Mr. Morris chose to rely on the hourly rates listed in the Adjusted *Laffey* Matrix, as opposed to the *Laffey* Matrix maintained by the United States Attorney's Office for the District of Columbia.  Both matrices have their genesis in the rates accepted as reasonable by the United States District Court in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983), and both have been updated yearly.  Because of differences in the Consumer Price Indices used to "bring forward" the 1981-1982 rates considered acceptable in *Laffey*, the rates listed in the USAO's *Laffey* Matrix are lower than those in the Adjusted *Laffey* Matrix.  The Court of Appeals for the D.C. Circuit has stated that parties may rely on the USAO's updated *Laffey* Matrix as baseline evidence of prevailing market rates for litigation counsel in the Washington, D.C., area, *see Covinton v. District of Columbia*, 57 F3d 1101, 1005 and n. 14, 1109 (D.C. Cir. 1995), but it also permits them to provide evidence of more appropriate market rates.  Other than simply citing to the Adjusted *Laffey* Matrix and the website on which it is maintained, however, Mr. Morris has not done so.

Frankly, the Court finds it somewhat difficult to understand why even the lower rates in the USAO's *Laffey* Matrix would be reasonable under the circumstances.  The Sixth Circuit has defined a reasonable fee as one that is "adequately compensatory to attract competent counsel

-17-

yet which avoids producing a windfall for lawyers." *Geier v. Sundquist*, 372 F.3d 784, 789 (6th Cir. 2004). "To arrive at a reasonable hourly rate, courts use as a guideline the prevailing market rate, defined as the rate that lawyers of comparable skill and experience can reasonably expect to command *within the venue* of the court of record." *Id.* at 791. Lawyers of comparable skill and experience in the Western District of Kentucky did not bill, and if they had the temerity to do so, did not actually command rates at the level of even the USAO's *Laffey* Matrix, much less the Adjusted *Laffey* Matrix, during the years in question.

Mr. Morris asserts that D.C. rates are appropriate given the relative dearth of class action specialists, and the even fewer number of attorneys willing to take on a national grocery store chain on a contingency basis. That may be true but – and this dovetails into the Court's third concern regarding Mr. Morris's billing statements – very little of the work performed by Mr. Morris was the type of work that would have required a putative civil rights class action specialist from Washington, D.C., with over twenty years' experience. The amount of Mr. Morris's time that was not duplicative of the work performed by the Cohen, Milstein and Wiggins, Childs firms was merely investigative. Although a senior partner would have been necessary to appropriately frame the areas of investigation and monitor progress, much of the work could have been more than competently performed by an mid-level associate. Frankly, it appears that a good deal could have been performed by a paralegal.

The work in this case that ultimately led to the discovery of evidence and information that ultimately allowed the parties to thoughtfully evaluate their claims and defenses, and to posture the case for the Settlement, was not the work performed by Mr. Morris. Rather it was the work performed by Cohen, Milstein and, to a less obvious extent (from the Court's admittedly limited perspective), Wiggins, Childs. It was those firms who performed class

counsel caliber work. They incurred the expenses for the experts whose statistical analyses were invaluable, but costly.  They, too, incurred the risk of non-payment of those expenses. And, it was they who flew frequently to Louisville, and spent countless hours in mediation sessions there.  The mediation sessions would not have been fruitful without statistical analysis, and the statistical analysis was the product of data obtained by Cohen, Milstein from Kroger, not from Mr. Morris's files.

Nevertheless, the Court will accept as true Mr. Morris's assertion that he did not choose the case, but rather it chose him when some of the Plaintiffs sought assistance from NAACP chapters and those chapters sought his assistance.  The Court will also accept that some level of investigation was necessary to even attract the attention of more prominent firms with the resources to fully and fairly prosecute the claims.  Given that there certainly are lawyers and firms in the Western District of Kentucky capable of providing as competent representation as Mr. Morris provided in this matter, however, the Court cannot justify awarding rates based on the Adjusted *Laffey* Matrix.  Instead it will use the lower rates in the matrix maintained by the D.C. United States Attorney's Office.

Because of the Court's concerns about Mr. Morris's billing statements, the Court cannot justify as awarding a lodestar fee based on 2008-2009 "senior partner rates" for every hour billed, however, even if those rates are the lower rates of the USAO *Laffey* Matrix.  In Exhibit A to this memorandum opinion, the Court has created a table of the hours claimed, the Court's independent calculation of those hours, the total amount of travel time, and the amount of time spent on clearly excessive travel.  The last column of the table is the amount of billable hours remaining after excessive travel time is removed.

-19-

In Exhibit B to this memorandum opinion, the Court calculated the various lodestar amounts that could be awarded based on the amount claimed versus historical rates, and historical rates with excessive travel time removed.  All of these rates, however, are the highest available (*i.e.*, those for persons with more than twenty years' experience) and assume that the rate is appropriate for the nature of the work performed.  Interestingly, without excessive travel time removed, the lodestar rate based on the historical "senior partner" rates from the USAO's *Laffey* Matrix is $400,133.50, curiously close to the $400,000 fee Mr. Morris offered to accept in a subsequent pleading in this case.  With an amount of hours removed to account for all the unnecessary driving time, and using only "senior partner" historical rates, the lodestar drops to $275,956.50.

The Court cannot justify even that greatly reduced total[9] as reasonable, however, since it would be an award entirely at "senior partner" rates, and the nature of the work actually performed cannot fairly be classified as demanding the skills of a senior partner.  Hence Exhibit C.  That table allocates the work, with excessive travel time removed, according to the maximum amount of hours that reasonably should have been expended by a senior partner versus how many could have, and arguably should have, been performed by a mid-level associate.[10]  With historical USAO *Laffey* Matrix rates applied to this allocation, the resulting lodestar is $200,347.50.  While the Court has doubts that a lawyer of comparable skill in the Western District of Kentucky could have commanded that fee for the work performed by Mr. Morris, it can nevertheless accept that figure as a reasonable award, if one assumes that the amount by

---

[9]The total is greatly reduced only with respect to Mr. Morris's initial request for over $700,000 and his subsequent offer to accept $400,000.

[10]This is, in the Court's opinion, a not-insignificant allotment, since a substantial amount of the work probably could have been performed by an experienced paralegal with skills in conducting witness interviews.

which it is higher than what a qualified local lawyer might have commanded is sufficient to compensate Mr. Morris for the delay in payment, plus the risk of non-payment he accepted when he began the work.

### 2.     The Allocation of Fees Among the Other Counsel

Mr. Morris's request for direct payment from the Settlement Fund complicates slightly the other attorneys' agreement regarding the appropriate allocation of fees and expenses.  As the Court understands it, Cohen, Milstein, Bruce Whitman and Wiggins, Childs are all in agreement that Mr. Sales's firms' fees of slightly less than $19,000 are to be paid directly, and that the two firms (Cohen, Milstein and Wiggins, Childs) would split the remainder of the fees and be equally responsible for expenses, with Cohen, Milstein paying Mr. Whitman from its share of the fees and Wiggins, Childs paying Mr. Morris from its share of the fees.  By directing that Mr. Morris be paid directly, the Court is not suggesting that the other attorneys' agreements should be disregarded, or their estimated recovery significantly affected.  In other words, by ordering that Mr. Morris's fee award be paid directly, it is not the Court's intention to eviscerate the other attorneys' existing agreements, or to direct that the amount of the Settlement Fund remaining after Mr. Morris's fee award has been granted be divided equally.  The Court is instead of the opinion that the remainder of the Settlement Fund be allocated in a manner that gives full effect to the other attorneys' agreements among themselves, none of which appears to be in dispute. The Court has every confidence that the two firms (Cohen, Milstein and Wiggins, Childs) and Mr. Morris can work cooperatively with Defendants' counsel to ensure that the appropriate amounts are directed to the appropriate persons.

**IV.**

For the reasons stated herein, and pursuant to Fed. R. Civ. P. 23, the Court finds that the Settlement Agreement entered into by the parties is fair, reasonable, and adequate.  The Court will grant Plaintiffs' Motion for Final Approval of Class Action Settlement and direct the payment of fees and expenses from the Settlement amount by separate order consistent, and entered concurrently,  with this Memorandum Opinion.

DATE:

cc:      counsel of record